Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| | | |
|---|---|---|
| ZULEIKA VEGA TIRADO<br><br>*Apelante*<br><br>v.<br><br>ANTILLES POWER DEPOT, INC.<br><br>*Apelado* | KLAN202500390 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Carolina<br><br>Caso Núm.: CA2024CV01031 (407)<br><br>Sobre: Despido Injustificado (Ley Núm. 80) y otros |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Adames Soto y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 14 de julio de 2025.

Comparece ante nos, Zuleika Vega Tirado (señora Vega o apelante) mediante recurso de *Apelación* y nos solicita que revoquemos parcialmente la *Sentencia*[1] emitida el 23 de abril de 2025 y notificada el 24 de abril de 2025, por el Tribunal de Primera Instancia, Sala Superior de Carolina (TPI o foro recurrido). Mediante el referido dictamen, el TPI declaró *Ha Lugar* en parte y *No Ha Lugar* en parte la *Moción de Sentencia Sumaria Parcial y en Solicitud de que se Bifurquen los Procedimientos*[2] presentada por la apelante.

Por los fundamentos que expondremos a continuación, se **modifica** la *Sentencia* apelada y, así modificada, se **confirma.**

**I.**

La génesis del caso de autos ocurrió cuando el 3 de abril de 2024, la señora Vega instó una *Demanda*[3] de despido injustificado y represalias contra Antilles Power Depot, Inc. (Antilles o apelada). En esta, alegó haber sido despedida de su empleo sin justa causa y

---

[1] Recurso de *Apelación*, págs. 244-246.
[2] Recurso de *Apelación*, págs. 17-41.
[3] Recurso de *Apelación*, págs. 1-8.

en represalias. Por tal razón, la apelante reclamó veintiún mil ciento sesenta dólares ($21,160.00) en concepto de mesada por su alegado despido injustificado al amparo de la Ley Núm. 80 del 30 de mayo de 1976, según enmendada, mejor conocida como la "*Ley Sobre Despidos Injustificados*" (Ley Núm. 80)[4]. Asimismo, solicitó quinientos mil dólares ($500,000.00) como compensación por alegados daños emocionales y económicos sufridos como consecuencia de su despido en represalias, al amparo de la Ley Núm. 115-1991, según enmendada, mejor conocida como la "*Ley contra el Despido Injusto o represalias a todo Empleado por Ofrecer Testimonio ante un Foro, Administrativo o Judicial*" (Ley Núm. 115-1991)[5]. Igualmente, la señora Vega se acogió al procedimiento sumario para reclamaciones laborales provisto por la Ley Núm. 2 del 17 de octubre de 1961, según enmendada, mejor conocida como la "*Ley de Procedimiento Sumario de Reclamaciones Laborales*[6]" (Ley Núm. 2).

Por su parte, el 19 de abril de 2024, Antilles presentó su *Contestación a la Querella; Solicitud de Desestimación al Amparo de la R. 10.2 de las de Procedimiento Civil*[7] en la cual sostuvo que el despido de la apelante fue justificado pues su desempeño no fue satisfactorio durante su periodo probatorio en la posición de "*Accounts Payables Specialist*".

Transcurrido algún tiempo y luego de concluido el descubrimiento de prueba, el 15 de enero de 2025, la señora Vega presentó *Moción de Sentencia Sumaria Parcial y en Solicitud de que se Bifurquen los Procedimientos.* La mencionada solicitud se acompañó junto a un *Juramento*[8] y una deposición[9] de la señora

---

[4] 29 LPRA sec. 185a *et seq.*
[5] 29 LPRA sec. 194 *et seq.*
[6] 32 LPRA sec. 3118 *et seq.*
[7] Recurso de *Apelación*, págs. 9-16.
[8] Recurso de *Apelación*, pág. 42.
[9] Recurso de *Apelación*, págs. 43-172.

Vega. En la solicitud, la apelante propuso los siguientes hechos que, a su juicio, no estaban en controversia:

1. La Querellante es mayor de edad, soltera, con dirección física en el Bo. Buena Vista Arriba, Carr. #3, Km. 85, Humacao, P.R. 00791, dirección postal en HC 11, Box 11997, Humacao, P.R. 00791, número de teléfono (939) 243-9641, y correo electrónico: zuleika.vega96@gmail.com. Véase Párrafo Núm. 1 de la *Querella*, admitido por la Querellada en su *Contestación*. Además, véase Declaración Jurada de la Querellante al final de este escrito.

2. La parte Querellada es Antilles Power Depot, Inc., una corporación doméstica con fines de lucro, con dirección física 1000 Carr. 860, Carolina, P.R. 00987, y dirección postal PO Box 810190, Carolina, P.R. 00981, y número de teléfono (787) 622-9330. Véase Párrafo Núm. 2 de la *Querella*, admitido por la Querellada en su *Contestación*. Además, véase Declaración Jurada de la Querellante al final de este escrito.

3. La Querellante tiene un bachillerato en contabilidad de la Universidad Ana G. Méndez, el cual obtuvo en el año 2017. Véase Anejo 1, Deposición de la Querellante, pág. 10, líneas 15-22. Además, véase Declaración Jurada de la Querellante al final de este escrito.

4. La Querellante fue contratada por la parte Querellada el 21 de septiembre de 2018, mediante contrato de empleo por tiempo indeterminado, para ocupar la posición de *SAGE Administrator*, adscrita al Departamento de Sistemas de Información de la Querellada. Véase Párrafo Núm. 3 de la *Querella*, admitido por la Querellada en su *Contestación*. Además, véase Anejo 1, Deposición de la Querellante, pág. 36, líneas 11-17, y pág. 37, líneas 10-12. Además, véase Anejo 2, Oferta de Empleo, Anejo 3, Contrato de Empleo, y Declaración Jurada de la Querellante al final de este escrito.

5. Cuando fue contratada por la parte Querellada en septiembre de 2018, la Querellante fue colocada en un periodo probatorio de doce (12) meses. Véase Anejo 3, Contrato de Empleo. Además, véase Declaración Jurada de la Querellante al final de este escrito.

6. La Querellante completó exitosamente su periodo probatorio de doce (12) meses y continuó trabajando para la Compañía. Véase Declaración Jurada de la Querellante al final de este escrito.

7. A partir de septiembre de 2020 hasta septiembre de 2022, la Querellante ocupó la posición de Líder de Compras y Logística. Véase Párrafo Núm. 5 de la *Querella*, admitido por la Querellada en su *Contestación*. Además, véase Declaración Jurada de la Querellante al final de este escrito.

8. A la Querellante nunca le entregaron el Manual de Empleados de la Compañía que fue revisado en julio de 2021. Véase Anejo 1, Deposición de la Querellante, pág. 49, líneas 20-23. Además, véase Declaración Jurada de la Querellante al final de este escrito.

9. En septiembre de 2022 la Querellante comenzó a ocupar la posición de *General Accountant* en el Área de Cuentas por Cobrar ("*Accounts Receivable*"). Véase Párrafo Núm. 7 de la Querella, admitido por la Querellada en su Contestación.

Además, véase Anejo 4, Carta de 26 de septiembre de 2022 promoviendo a la Querellante a la posición de *General Accountant / Accounts Receivable*. Además, véase Declaración Jurada de la Querellante al final de este escrito.

10. Para marzo de 2023, la parte Querellada despidió al supervisor de la Querellante, Héctor Cortes, quien ocupaba la posición de *Controller*, y para principios de abril de 2023 comenzó a trabajar la nueva *Controller*, Annette López. Véase Párrafo Núm. 8 de la *Querella*, admitido por la Querellada en su *Contestación*. Además, véase Declaración Jurada de la Querellante al final de este escrito.

11. En septiembre de 2023, a la Querellante le hicieron una evaluación de desempeño, donde el resultado fue "*exceeds expectations.*" Véase Párrafo Núm. 9 de la Querella, admitido por la Querellada en su *Contestación*. Además, véase Anejo 5, *Employee Performance Evaluation* del 22 de septiembre de 2023, y Declaración Jurada de la Querellante al final de este escrito.

12. El 30 de noviembre de 2023, una compañera de trabajo de la Querellante del área de Cuentas por Pagar ("*Accounts Payable*") renunció al trabajo. Ese mismo día, la *Controller*, Annette López, reunió a la Querellante y a otra compañera de trabajo llamada Lou Ann Moreau, quien se desempeñaba como recepcionista y asistía en algunas tareas de "*Accounts Receivable*" a la Querellante, y les hizo el acercamiento de que la Querellante pasara a trabajar al Área de Cuentas por Pagar ("*Accounts Payable*"), debido a que la Querellante tenía experiencia previa en compras y logística, y conocía a algunos suplidores, y que Lou Ann Moreau, pasara a ocupar la posición que tenía la Querellante en el Área de Cuentas por Cobrar ("*Accounts Receivable*"). Véase Párrafo Núm. 10 de la *Querella*, admitido por la Querellada en su *Contestación*. Además, véase Declaración Jurada de la Querellante al final de este escrito.

13. Cuando la *Controller*, Annette López, le hizo el acercamiento a la Querellante para que pasara a trabajar al Área de Cuentas por Pagar ("*Accounts Payable*"), la Querellante se quejó verbalmente con Annette López con relación a su compensación en dicha nueva posición. Véase Anejo 1, Deposición de la Querellante, pág. 68, líneas 13-22, pág. 70, líneas 1-16, y pág. 71, líneas 18-25. Además, véase Declaración Jurada de la Querellante al final de este escrito.

14. La Querellante también discutió y se quejó verbalmente sobre el asunto del salario en su nueva posición con el *General Manager*, José Escobar. Véase Anejo 1, Deposición de la Querellante, pág. 72, líneas 8-13. Además, véase Anejo 20, Correos electrónicos entre la Querellante y José Escobar de 1 de diciembre de 2023, y además, véase Declaración Jurada de la Querellante al final de este escrito.

15. Ante la queja verbal de la Querellante con relación al salario que devengaría en su nueva posición en el Área de Cuentas por Pagar ("*Accounts Payable*"), la *Controller*, Annette López, indicó a la Querellante que evaluarían un posible aumento de salario para ésta luego de que cumpliera tres (3) meses en la nueva posición. Véase Anejo 1, Deposición de la Querellante, pág. 74, líneas 1-10. Además, véase Declaración Jurada de la Querellante al final de este escrito.

16. La Hoja de Cambio que refleja el cambio de posición de la Querellante del Área de Cuentas por Cobrar ("*Accounts*

*Receivable*") al Área de Cuentas por Pagar ("*Accounts Payable*") indica que la fecha de efectividad del cambio es el 4 de diciembre de 2023, y establece lo siguiente: "*Según discutido con la empleada, se estará evaluando su progreso y dominio de sus nuevas tareas por los próximos tres meses. Una vez muestre dominio de las tareas, se procederá a una revision de salario.*" Véase Anejo 6, Hoja de Cambio. Además, véase Declaración Jurada de la Querellante al final de este escrito.

17. La Hoja de Cambio, en la parte titulada "Acuerdos", indica que el "Acuerdo" es realizar una evaluación y revisión de salario el lunes 4 de marzo de 2024. Véase Anejo 6, Hoja de Cambio. Además, véase Declaración Jurada de la Querellante al final de este escrito.

18. A la Querellante en ningún momento le indicaron que iba a ser colocada en un nuevo periodo probatorio. Véase Anejo 1, Deposición de la Querellante, pág. 74, líneas 11-12, y pág. 80, líneas, 14-15. Además, véase Declaración Jurada de la Querellante al final de este escrito.

19. La Querellante y Lou Ann Moreau comenzaron en sus nuevas posiciones durante la semana del 11 al 15 de diciembre de 2023. Véase Párrafo Núm. 17 de la *Querella*, admitido por la Querellada en su *Contestación*. Además, véase Declaración Jurada de la Querellante al final de este escrito.

20. El cambio o promoción de la Querellante a la posición en el Área de Cuentas por Pagar ("*Accounts Payable*") fue anunciado por la Compañía a todos sus empleados el 12 de diciembre de 2023. Véase Anejo 7, Correo Electrónico de Annette López a todos los empleados. Además, véase Declaración Jurada de la Querellante al final de este escrito.

21. En la Fiesta de Navidad de la Compañía celebrada en diciembre del año 2023, se reconoció y agradeció públicamente a la Querellante por sus cinco (5) años de servicio de excelencia para la Compañía "por su invaluable contribución a través de los años. Su lealtad y dedicación ha sido parte integral de nuestro éxito." Véase Anejo 8, Reconocimiento entregado a la Querellante en la Fiesta de Navidad de 2023. Además, véase Declaración Jurada de la Querellante al final de este escrito.

22. El 5 de febrero de 2024, la Querellante envió a la *Controller*, Annette López, por el sistema de nómina ADP, una solicitud de tres (3) días de vacaciones, específicamente el jueves 7, viernes 8 y lunes 11 de marzo de 2024, respectivamente, regresando al trabajo el martes 12 de marzo de 2024. Ello, pues la Querellante tenía planificado un viaje familiar a Disney World en Florida. La *Controller* le aprobó la solicitud de vacaciones inmediatamente a la Querellante, quien tenía balance más que suficiente para solicitar esos tres (3) días. Véase Párrafo Núm. 18 de la *Querella*, admitido por la Querellada en su *Contestación*. Además, véase Anejo 9, *List of Requests*. Además, véase Declaración Jurada de la Querellante al final de este escrito.

23. A principios de febrero de 2024, la Querellante compró los pasajes para irse a Disney World de vacaciones. Véase Anejo 1, Deposición de la Querellante, pág. 107, línea 25, y pág. 108, líneas 1-14. Además, véase Declaración Jurada de la Querellante al final de este escrito.

24. El lunes 4 de marzo de 2024 era la fecha en que se supone que se evaluara el desempeño de la Querellante en su nueva posición y se discutiera el asunto del salario. Véase Anejo 6, Hoja de Cambio. Además, véase Declaración Jurada de la Querellante al final de este escrito.

25. El lunes 4 de marzo de 2024, antes de entrar a trabajar, la Querellante visitó un laboratorio médico para hacerse unos exámenes. Llegó al trabajo alrededor de las 9 a.m. Véase Declaración Jurada de la Querellante al final de este escrito.

26. Durante su periodo de almuerzo, la Querellante recibió una llamada del laboratorio para saber si había recibido los resultados de los análisis y le dejaron saber que tenía que pasar por una sala de emergencia lo antes posible, ya que la Querellante tenía la hemoglobina sumamente baja. Véase Anejo 1, Deposición de la Querellante, pág. 114, líneas 18-24. Luego de dicha llamada, la Querellante recibió copia de los resultados de los laboratorios por correo electrónico. *Íd.* Además, véase Anejo 10, Resultados del Laboratorio, y Declaración Jurada de la Querellante al final de este escrito.

27. En ese momento, la Querellante le dejó saber a su supervisora, la *Controller*, Annette López, lo que le habían indicado del laboratorio, y ésta le indicó que se fuera lo antes posible para el hospital, y que le dejara saber si al día siguiente no iba a poder ir a trabajar. Véase Declaración Jurada de la Querellante al final de este escrito.

28. El lunes 4 de marzo de 2024, la Querellante trabajó hasta alrededor del mediodía, antes de marcharse a la Sala de Emergencias. Véase Anejo 1, Deposición de la Querellante, pág. 99, líneas 4-16. Además, véase Declaración Jurada de la Querellante al final de este escrito.

29. El lunes 4 de marzo de 2024, no se llevó a cabo la evaluación del desempeño de la Querellante en su nueva posición, ni se discutió el asunto de la compensación. Véase Anejo 1, Deposición de la Querellante, pág. 99, líneas 4-16. Además, véase Declaración Jurada de la Querellante al final de este escrito.

30. El lunes 4 de marzo de 2024, la Querellante fue hospitalizada en el Hospital Menonita de Humacao con síntomas de anemia. Véase Anejo 11, Declaración Jurada de la Dra. Jivet Morales, párrafo 4. Además, véase Declaración Jurada de la Querellante al final de este escrito.

31. La Dra. Jivet Morales fue la doctora que atendió a la Querellante cuando ésta fue hospitalizada en el Hospital Menonita de Humacao el 4 de marzo de 2024. Véase Anejo 11, Declaración Jurada de la Dra. Jivet Morales, párrafo 5. Además, véase Declaración Jurada de la Querellante al final de este escrito.

32. El martes 5 de marzo de 2024, a través de WhatsApp, la Querellante le escribió a la *Controller* que no iba a poder presentarse a trabajar debido a que estaba hospitalizada y que estaba esperando una transfusión de sangre. La *Controller* le dijo a la Querellante que estaba bien, que si necesitaba que ella le llevara algo al hospital, a lo que la Querellante le dijo que no necesitaba nada. Ese mismo día, por la tarde, la *Controller* le escribió preguntándole que cómo había seguido, y la Querellante le indicó que estaba mejorando y que ya le habían puesto la segunda bolsita de la transfusión de sangre. La *Controller* le dijo a la Querellante

que si necesitaba más tiempo podía tomar todo el tiempo que necesitara, a lo que la Querellante respondió que gracias. Véase Anejo 12, Intercambio de mensajes por WhatsApp entre Annette López y la Querellante. Además, véase Declaración Jurada de la Querellante al final de este escrito.

33. El miércoles 6 de marzo de 2024, la Dra. Jivet Morales le dio de alta a la Querellante y le entregó un certificado médico recomendándole Descanso por diez (10) días. Véase Anejo 11, Declaración Jurada de la Dra. Jivet Morales, párrafo 9. Además, véase Anejo 13, Certificado Médico de 6 de marzo de 2024, y Declaración Jurada de la Querellante al final de este escrito.

34. El certificado médico indica que la Dra. Noelia Flores De Jesús es la "Profesional de Salud Principal", ya que ella es la jefa del grupo médico del Hospital Menonita de Humacao, pero el certificado médico fue preparado y firmado por la Dra. Jivet Morales. Véase Anejo 11, Declaración Jurada de la Dra. Jivet Morales, párrafo 11. Además, véase Anejo 1, Deposición de la Querellante, pág. 30, líneas 3-5, y Declaración Jurada de la Querellante al final de este escrito.

35. A las 9:57 p.m. del 6 de marzo de 2024, la Querellante le envió un mensaje por WhatsApp a la *Controller*, Annette López, indicándole que le habían dado un certificado médico recomendando descanso por diez (10) días y que le iba a enviar copia del mismo al día siguiente por email. Véase Anejo 12, Intercambio de mensajes por WhatsApp entre Annette López y la Querellante. La *Controller* le respondió que le iba a pagar esos días por enfermedad, que no se preocupara, y que le enviara el certificado médico cuando pudiera. *Íd.* Además, véase Declaración Jurada de la Querellante al final de este escrito.

36. El jueves 7 de marzo de 2024, en horas de la mañana, la Querellante viajó a Orlando, Florida para ir a Disney World con su familia, según tenía planificado. Véase Anejo 14, Itinerario de Viaje. Además, véase Declaración Jurada de la Querellante al final de este escrito.

37. El jueves 7 de marzo de 2024, a las 9:06 a.m., la *Controller*, Annette López, le envió el siguiente mensaje de WhatsApp a la Querellante: "Hola que disfruten. Recuerda enviarme el certificado antes del lunes." Véase Anejo 12, Intercambio de mensajes por WhatsApp entre Annette López y la Querellante. Además, véase Declaración Jurada de la Querellante al final de este escrito.

38. El jueves, 7 de marzo de 2024, a las 10:30 a.m., la Querellante le envió copia del certificado médico a la *Controller*, Annette López, por correo electrónico. Véase Anejo 15, Correo electrónico del 7 de marzo de 2024. Además, véase Declaración Jurada de la Querellante al final de este escrito.

39. A las 11:41 a.m. del jueves, 7 de marzo de 2024, por WhatsApp, la *Controller*, Annette López confirmó el recibo del certificado médico. Véase Anejo 12, Intercambio de mensajes por WhatsApp entre Annette López y la Querellante. Además, véase Declaración Jurada de la Querellante al final de este escrito.

40. En múltiples ocasiones, entre el 8 y el 15 de marzo de 2024, la *Controller* Annette López se comunicó por teléfono y por correo electrónico con personal del Hospital Menonita de

Humacao, incluyendo con la Dra. Noelia Flores De Jesús, intentando obtener información sobre el certificado médico que la Dra. Jivet Morales Morales le había entregado a la Querellante el 6 de marzo de 2024. Véase Anejo 16, Declaración Jurada de la Dra. Noelia Flores De Jesús, párrafo 10. Además, véase Anejo 17, Correos Electrónicos entre la *Controller* y personal del Hospital Menonita.

41. La *Controller* deseaba saber si el certificado médico que la Dra. Jivet Morales Morales le había entregado a la Querellante, recomendándole descanso por diez (10) días, era legítimo. Véase Anejo 16, Declaración Jurada de la Dra. Noelia Flores De Jesús, párrafo 11. Además, véase Anejo 17, Correos Electrónicos entre la *Controller* y personal del Hospital Menonita.

42. La *Controller* Annette López me preguntó insistentemente por qué le habían dado a la paciente Zuleika Vega Tirado tantos días de descanso. Véase Anejo 16, Declaración Jurada de la Dra. Noelia Flores De Jesús, párrafo 13.

43. La Dra. Noelia Flores De Jesús, directora del grupo médico del Hospital Menonita de Humacao personalmente le indicó a la *Controller* Annette López que el certificado médico firmado por la Dra. Jivet Morales Morales era legítimo y que, sin autorización de la paciente, el Hospital no podía darle ninguna otra información, de conformidad con la ley federal HIPAA. Véase Anejo 16, Declaración Jurada de la Dra. Noelia Flores De Jesús, párrafo 14.

44. El martes, 12 de marzo de 2024, a las 10:02 a.m., la *Controller*, Annette López, envió el siguiente correo electrónico a Suheill Velázquez del Hospital Menonita:

*Buenos días,*

*Por este medio estoy solicitando una certificación médica de la empleada Zuleika Vega Tirado, fecha de Nacimiento Junio 8, 1993.*

*Zuleika es empleada en Antilles Power Depot y ha estado ausente desde el 4 de marzo de 2024. Se le solicitó certificado médico el cual necesitamos confirmar que en efecto estuvo enferma.*

*Esta servidora es su supervisora directa y también quien procesa la nómina de la compañía. De necesitar comunicarse conmigo puede llamarme al teléfono 939-385-9719.*

*Gracias.*

Véase Anejo 17, Correos Electrónicos entre la *Controller* y personal del Hospital Menonita.

45. El 14 de marzo de 2024, a la 1:01 p.m., Suheill Velázquez, del Hospital Menonita, le respondió el correo electrónico a la *Controller*, Annette López, de la siguiente manera:

*Saludos Sra. López:*

*La Ley HIPPA me prohíbe divulgar o enviar información de un expediente de salud, sin la autorización del paciente.*

*En mi carácter, solo puedo validar que el documento sea de la institución.*

*Favor de enviarme el documento, para poder verificar, de lo contrario necesitaré autorización del paciente, para brindar información adicional. Gracias.*

<u>Véase</u> Anejo 17, Correos Electrónicos entre la Controller y personal del Hospital Menonita.

46. El 14 de marzo de 2024, a la 1:13 p.m., la *Controller*, Annette López, envió el siguiente correo electrónico a Suheill Velázquez del Hospital Menonita, con copia del certificado médico que la Querellante ya le había enviado:

*Buenas tardes,*

*Documento adjunto. Favor de verificar las fechas ya que se fue de viaje a Disney el 5 de marzo lo que no concuerda con la gravedad de su enfermedad.*

*Tenemos evidencia de su viaje.*

*Gracias.*

<u>Véase</u> Anejo 17, Correos Electrónicos entre la Controller y personal del Hospital Menonita.

47. El 15 de marzo de 2024, a las 12:55 p.m., Suheill Velázquez, del Hospital Menonita, le envió el siguiente correo electrónico a la *Controller*, Annette López:

*Saludos Sra. López*

*Consulté el caso con la Oficina de Cumplimiento de nuestra organización, y no Podemos brindar, ni validar ninguna información de nuestro paciente, a menos que medie una autorización de la misma (Ley HIPAA).*

*Muchas gracias.*

<u>Véase</u> Anejo 17, Correos Electrónicos entre la *Controller* y personal del Hospital Menonita.

48. La Querellante regresó de su viaje a Disney World en la madrugada del 12 de marzo de 2024. <u>Véase</u> Declaración Jurada de la Querellante al final de este escrito.

49. El viernes 15 de marzo de 2024, la Querellante recibió un mensaje de la *Controller*, Annette López, indicándole que le había enviado un correo electrónico para recordarle que, el lunes 18 de marzo de 2024, trajera el certificado médico original. La Querellante le respondió que "Ok". <u>Véase</u> Anejo 12 - Intercambio de mensajes por WhatsApp entre Annette López y la Querellante. Además, <u>véase</u> Declaración Jurada de la Querellante al final de este escrito.

50. El certificado médico decía que la Querellante debía regresar a trabajar el 16 de marzo de 2024, pero como ese día era sábado, y la Querellante no trabaja los sábados, ésta se reportó a trabajar el lunes 18 de marzo de 2024. <u>Véase</u> Declaración Jurada de la Querellante al final de este escrito.

51. El lunes 18 de marzo de 2024, la Querellante se reportó a trabajar y, tan pronto llegó la *Controller,* la Querellante la notó molesta. La Querellante le hizo entrega inmediatamente del certificado médico original, según solicitado, y le preguntó a la *Controller* si necesitaba algún otro documento, ya que la Querellante tenía toda la documentación que le fue

provista por el hospital. La *Controller* le contestó a la Querellante que no necesitaba más nada, porque lo demás alegadamente era confidencial. Así las cosas, la Querellante procedió a continuar con sus labores. Véase Declaración Jurada de la Querellante al final de este escrito. Además véase Anejo 1, Deposición de la Querellante, pág. 118, líneas 10-11.

52. El martes 19 de marzo de 2024, la Querellante se reportó a trabajar como de costumbre, pero continuó notando a la *Controller* molesta, y sintiendo el ambiente laboral extraño e incómodo. Véase Declaración Jurada de la Querellante al final de este escrito.

53. El miércoles 20 de marzo de 2024, la Querellante se reportó a trabajar como de costumbre, pero continuó notando a la *Controller* molesta. Ese día, luego del periodo de tomar alimentos de la Querellante, la *Controller* le solicitó que se reportara a la oficina del Gerente General, José Escobar, para discutir la evaluación. Véase Declaración Jurada de la Querellante al final de este escrito.

54. A las 2:30 p.m., la Querellante se reportó a la oficina del Gerente General, según solicitado. El Sr. Escobar le dio a la Querellante copia impresa de la evaluación del periodo de los tres meses en la nueva posición de Cuentas por Pagar ("*Accounts Payable*") para que la Querellante cotejara la misma, en lo que la *Controller* subía a la oficina para unirse a ellos. La Querellante procede a observar la evaluación y se percata que el resultado de todos los criterios de evaluación era "insatisfactorio" o "necesita mejorar", y que el resultado final de la evaluación había sido "insatisfactorio". Obviamente, a la Querellante le tomó por sorpresa dicha evaluación, pues jamás nadie le había manifestado que estaba haciendo algo mal, sino todo lo contrario. Véase Declaración Jurada de la Querellante al final de este escrito. Además, véase Anejo 18, *Employee Performance Evaluation* de 4 de diciembre de 2023 a 4 de marzo de 2024.

55. La Querellante no tiene ninguna amonestación, ni memo disciplinario alguno en su expediente de personal. Véase Párrafo Núm. 29 de la *Querella*, admitido por la Querellada en su *Contestación*. Además, véase Declaración Jurada de la Querellante al final de este escrito.

56. Así las cosas, la Querellante le manifestó al Sr. Escobar y a la Sra. Annette López que deseaba discutir la evaluación con ellos punto por punto. Sin embargo, estos hicieron caso omiso a la Querellante, por lo que la Querellante tuvo que tomar la iniciativa y comenzar a discutir la evaluación punto por punto. Véase Declaración Jurada de la Querellante al final de este escrito.

57. En el primer punto, titulado "*Knowledge of Work*", la Querellante obtuvo una puntuación de dos (2) ("*developing*"), y el comentario escrito que tiene la evaluación es el siguiente: "*The employee understands her roles on the accounts payables but has not shown interest on taking ownership on her responsibilities as an accounts payable specialist.*" Véase Anejo 18, *Employee Performance Evaluation* de 4 de diciembre de 2023 a 4 de marzo de 2024. Además, véase Declaración Jurada de la Querellante al final de este escrito.

58. En el segundo punto, titulado "*Productivity*", la Querellante obtuvo una puntuación de uno (1) ("*unsatisfactory*"), y el comentario escrito que tiene la

evaluación es el siguiente: "*After 3 months on the position, Zuleika hasn't been able to set herself timelines to finish her task. She has requested vacations during her period of performance evaluation.*" Véase Anejo 18, *Employee Performance Evaluation* de 4 de diciembre de 2023 a 4 de marzo de 2024. Además, véase Declaración Jurada de la Querellante al final de este escrito.

59. En ese momento, la Querellante le explicó a la *Controller* que, independientemente si ella estaba por vacaciones o por enfermedad, ella no iba a poder trabajar esos días, ya que tenía un certificado médico recomendándole descanso por diez (10) días. Además, le recordó a la *Controller* que los días que ella había solicitado de vacaciones caían fuera del periodo de evaluación, el cual culminaba el 4 de marzo de 2024. En ese momento, la *Controller* abandonó la reunión y el Gerente General, José Escobar, notificó a la Querellante que estaba despedida inmediatamente. Véase Declaración Jurada de la Querellante al final de este escrito.

60. No se terminó de discutir la evaluación. La Querellante fue escoltada a su oficina, recogió sus cosas y se fue. Véase Declaración Jurada de la Querellante al final de este escrito.

61. El jueves 21 de marzo de 2024, la Querellante recibió una llamada de su compañera de trabajo Lou Ann Moreau, quien le indicó a la Querellante que deseaba decirle la verdadera razón por la cual la habían despedido. Dicha llamada tuvo una duración de una hora y cincuenta y siete minutos (01:57:00). Véase Anejo 19, Screenshot de la llamada entre la Querellante y Lou Ann Moreau. Específicamente, Lou Ann Moreau explicó a la Querellante que la *Controller* pensaba que ella (la Querellante) había falsificado el certificado médico y que ella (Lou Ann Moreau) había escuchado cuando el Gerente General, José Escobar, dio instrucciones a la *Controller* para que "dañara" la evaluación de la Querellante y así poder justificar su despido de manera inmediata. Véase Declaración Jurada de la Querellante al final de este escrito.

62. Al otro día, viernes 22 de marzo de 2024, la Querellante fue al hospital a preguntar si alguien del hospital le había indicado a la *Controller* o a alguien de la Compañía que el certificado médico era falso. La Querellante específicamente habló con la Dra. Jivet Morales, quien fue la doctora que firmó el certificado médico, y con la Dra. Noelia Flores De Jesús, jefa del grupo médico del Hospital. Esta última le indicó a la Querellante que ella (la Dra. Noelia Flores De Jesús) había hablado con Annette López, *Controller*, y le había validado personalmente la veracidad del certificado médico, de la firma de la Dra. Jivet Morales, y de los diez (10) días de descanso que se le recomendó a la Querellante en dicho certificado. Véase Declaración Jurada de la Querellante al final de este escrito; además véase Anejo 16, Declaración Jurada de la Dra. Noelia Flores De Jesús, párrafo 14.

63. Al momento del despido de la Querellante, no había ninguna división o departamento de Recursos Humanos en la Compañía. Véase Anejo 1, Deposición de la Querellante, pág. 63, líneas 2-7. Todo lo relacionado a recursos humanos lo manejaba el Gerente General, José Escobar. *Íd.*, pág. 66, líneas 8-10. Además, véase Declaración Jurada de la Querellante al final de este escrito.

64. El salario más alto recibido por la Querellante durante sus últimos tres años de empleo fue de $47,840.00. Véase

Párrafo Núm. 36 de la *Querella*, admitido por la Querellada en su *Contestación*. Además, véase Declaración Jurada de la Querellante al final de este escrito.

65. El último día de trabajo de la Querellante con la Querellada fue el 20 de marzo de 2024, hasta alrededor de las 3:00 p.m. Véase Anejo 1, Deposición de la Querellante, pág. 26, líneas 4-6, y pág. 28, líneas 10-14. Además, véase Declaración Jurada de la Querellante al final de este escrito[10].

Así pues, solicitó que el foro apelado:

(1) declare Con Lugar la causa de acción de la Querellante al amparo de la Ley Núm. 80- 1976, ordenando a la Querellada a pagarle a una compensación ("mesada") de $21,160.00, equivalente a tres meses y diez (10) semanas de salario, más un 25% de honorarios de abogado, y
(2) declare Con Lugar la causa de acción de la Querellante al amparo de la Ley Núm. 115- 1991, y que señale una vista para recibir la prueba de los daños económicos y emocionales sufridos por la Querellante[11].

En respuesta, el 25 de marzo de 2025, Antilles sometió su *Oposición a "Moción de Sentencia Sumaria Parcial y en Solicitud de que se Bifurquen los Procedimientos"*[12]. En esta, la apelada aceptó la mayoría de los hechos incontrovertidos propuestos por la señora Vega. Sin embargo, alegó que el reclamo de la apelante era improcedente porque el despido había sido justificado. Igualmente, adujo que la señora Vega no pudo establecer un caso *prima facie* de represalias.

Evaluadas las posiciones de las partes, el 23 de abril de 2025[13], el foro apelado emitió una Sentencia en la cual dictaminó lo siguiente:

[S]e declara Ha lugar la solicitud de sentencia sumaria respecto a la acción de despido injustificado y No ha lugar a la reclamación sobre represalia.

Por tanto, se ordena a la parte querellada a pagar a la parte querellante $21,600.00. Así también se ordena la desestimación con perjuicio de las alegaciones sobre represalia[14].

Inconforme con la determinación, la señora Vega recurrió ante este foro mediante recurso de *Apelación* y señaló el siguiente error:

---

[10] Recurso de *Apelación*, págs. 19-30.
[11] Recurso de *Apelación*, pág. 40.
[12] Recurso de *Apelación*, págs. 218-234.
[13] Notificada el 24 de abril de 2025.
[14] Recurso de *Apelación*, pág. 246.

> Erró el TPI al declarar No Ha Lugar la moción de sentencia sumaria en cuanto a la reclamación de represalias presentada por la Querellante-Apelante al amparo de la Ley 115-1991, y desestimar la misma con perjuicio.

Luego de solicitar un término adicional, el 30 de junio de 2025, Antilles presentó su alegato en oposición. En su escrito, la apelada adujo que en el presente caso no existía expresión alguna que estuviera protegida de la señora Vega, específicamente relacionada con su despido, por lo que no existía nexo causal entre ambos eventos.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

**II.**

**-A-**

El mecanismo procesal de la sentencia sumaria surge de la Regla 36 de las de Procedimiento Civil[15]. El propósito de la precitada regla es facilitar la solución justa, rápida y económica de litigios civiles en los cuales no existe controversia real y sustancial de hechos materiales que no requieren ventilarse en un juicio plenario[16]. Por medio de este mecanismo, una parte puede solicitar que el tribunal dicte sentencia sumaria de la totalidad de la reclamación o parte de esta[17]. De esta forma, se promueve la descongestión de calendarios, así como la pronta adjudicación de controversias cuando una audiencia formal resulta en una dilación innecesaria[18]. No obstante, la sentencia sumaria solo está disponible para la disposición de aquellos casos que sean claros; cuando el tribunal tenga ante sí la verdad de todos los hechos esenciales alegados en la demanda; y que solo reste por disponer las controversias de derecho existentes[19].

---

[15] 32 LPRA Ap. V, R. 36.
[16] *Rodríguez García v. UCA*, 200 DPR 929, 940 (2018).
[17] *Vera v. Dr. Bravo*, 161 DPR 308, 332 (2004).
[18] *Íd.*, págs. 331-332.
[19] *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, 136 DPR 881, 911-912 (1994).

Por su parte, el promovente de una sentencia sumaria deberá establecer, mediante declaraciones juradas o con prueba admisible en evidencia, que no existe controversia real respecto a hechos materiales de la controversia[20]. Por hechos materiales se entienden aquellos que pueden afectar el resultado de una reclamación de acuerdo con el derecho sustantivo[21].

En contraste, el oponente a la moción de sentencia sumaria está obligado a establecer que existe una controversia que sea real por lo cual cualquier duda es insuficiente para derrotar una solicitud de sentencia sumaria[22]. En efecto, la duda debe ser tal que permita concluir que existe una controversia real y sustancial sobre los hechos materiales[23]. De esta manera, la parte promovida debe puntualizar los hechos propuestos que pretende controvertir, y hacer referencia a la prueba específica que sostiene su posición[24]. Es decir, "la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa"[25]. No puede descansar en meras aseveraciones o negaciones de sus alegaciones, sino que debe proveer contradeclaraciones juradas y documentos que sustenten los hechos materiales en disputa[26].

Así pues, la Regla 36.3 de las de Procedimiento Civil establece el procedimiento para la consideración de la moción de sentencia sumaria, así como el contenido de la moción y de la contestación de la parte promovida[27]. Respecto a la moción para que se dicte una sentencia sumaria, la Regla 36.3 (a) de las de Procedimiento Civil dispone que la misma tiene que desglosar lo siguiente:

(1) una exposición breve de las alegaciones de las partes;

---

[20] *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 110 (2015).
[21] *Ramos Pérez v. Univisión,* 178 DPR 200, 213 (2010).
[22] *Meléndez González et al. v. M. Cuebas*, *supra*, pág. 110.
[23] *Íd.*
[24] *León Torres v. Rivera Lebrón,* 204 DPR 20, 44 (2020).
[25] *Íd.,* pág. 44.
[26] *Ramos Pérez v. Univisión, supra*, págs. 215-216.
[27] 32 LPRA Ap. V, R. 36.3.

(2) los asuntos litigiosos o en controversia;

(3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria;

(4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;

(5) las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y

(6) el remedio que debe ser concedido[28].

Por otra parte, la Regla 36.3 (b) de las de Procedimiento Civil dispone que la contestación a la moción de sentencia sumaria debe contener, además de los sub incisos (1), (2) y (3) del inciso (a): una relación de los hechos esenciales y pertinentes que están en controversia, con referencia a los párrafos enumerados por la parte promovente y con indicación de la prueba en la que se establecen esos hechos; una enumeración de los hechos que no están en controversia; y las razones por las cuales no se debe dictar la sentencia, argumentando el derecho aplicable[29]. Asimismo, cuando se presente una solicitud de sentencia sumaria conforme a la Regla 36 de las de Procedimiento Civil, *supra*, "la parte contraria no podrá descansar solamente en las aseveraciones o negaciones contenidas en sus alegaciones, sino que estará obligada a contestar en forma tan detallada y específica como lo haya hecho la parte promovente. De no hacerlo así, se dictará la sentencia sumaria en su contra si procede"[30].

Analizados estos criterios, el tribunal no dictará sentencia sumaria cuando: "(1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la demanda que no han sido refutadas; (3) surja de los propios documentos que

---

[28] 32 LPRA Ap. V, R. 36.3 (a).
[29] 32 LPRA Ap. V, R. 36.3 (b).
[30] 32 LPRA Ap. V, R. 36.3 (c).

acompañan la moción una controversia real sobre algún hecho material y esencial, o (4) como cuestión de derecho, no proceda"[31]

Entretanto, desde el punto de vista procesal, la Regla 36.4 de las de Procedimiento Civil[32], dispone que:

> [s]i en virtud de una moción presentada bajo las disposiciones de esta regla no se dicta sentencia sobre la totalidad del pleito, ni se concede todo el remedio solicitado o se deniega la misma, y es necesario celebrar juicio, será obligatorio que el tribunal resuelva la moción mediante una determinación de los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial y los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos, y hasta qué extremo la cuantía de los daños u otra reparación no está en controversia, ordenando los procedimientos ulteriores que sean justos en el pleito, incluso una vista evidenciaria limitada a los asuntos en controversia. Al celebrarse el juicio, se considerarán probados los hechos así especificados y se procederá de conformidad.
>
> [...]

Finalmente, es menester destacar que, este Tribunal utilizará los mismos criterios que el Tribunal de Primera Instancia al determinar si procede una moción de sentencia sumaria[33]. Por consiguiente, los criterios que este foro intermedio debe tener presentes al atender la revisión de una sentencia sumaria son los siguientes:

(1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil y la jurisprudencia le exigen al foro primario;

(2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36;

(3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos;

(4) y de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia[34].

---

[31] *Acevedo y otros v. Depto. Hacienda y otros,* 212 DPR 335, 336 (2023).
[32] 32 LPRA Ap. V, R. 36.4.
[33] *Vera v. Dr. Bravo, supra,* pág. 334.
[34] *Roldan Flores v. M. Cuebas,* 199 DPR 664, 679 (2018).

**-B-**

Ley Núm. 115-1991, *supra,* se aprobó con el propósito de proteger a todo empleado que sea despedido, amenazado u objeto de discrimen en su empleo o cargo, por haber ofrecido testimonio ante un foro administrativo, judicial o legislativo[35]. El término "empleado" es definido como "cualquier persona que preste servicios a cambio de salarios, o cualquier tipo de remuneración, mediante un contrato oral, escrito, explícito o implícito"[36]. La Ley Núm. 115-1991, *supra,* en su Artículo 2(a)[37] establece la mencionada protección:

> Ningún patrono podrá despedir, amenazar o discriminar contra un empleado con relación a los términos, condiciones, compensación, ubicación, beneficios o privilegios del empleo porque el empleado ofrezca o intente ofrecer, verbalmente o por escrito, cualquier testimonio, expresión o información ante un foro legislativo, administrativo o judicial en Puerto Rico, así como el testimonio, expresión o información que ofrezca o intente ofrecer, en los procedimientos internos establecidos de la empresa, o ante cualquier empleado o representante en una posición de autoridad, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada establecida por ley.

Ahora bien, los empleados tienen disponible dos vías para establecer una causa de acción por represalias[38]. La primera es presentar evidencia directa o circunstancial que demuestre un nexo causal entre la conducta del demandado y el daño sufrido[39]. La segunda es establecer, por preponderancia de la prueba, un caso *prima facie* mediante evidencia que demuestre que el empleado: (1) participó en una actividad protegida por la Ley contra Represalias y (2) fue subsiguientemente despedido, amenazado o discriminado en su contra por su patrono (nexo causal)[40]. Una actividad protegida, por la Ley Núm. 115-1991, *supra,* es ofrecer o intentar ofrecer, verbalmente o por escrito, cualquier testimonio, expresión o información ante: (1) un foro legislativo, administrativo o judicial en

---

[35] *Velázquez Ortiz v. Mun. De Humacao,* 197 DPR 656, 668-669 (2017).
[36] Artículo 1 (a) de la Ley 115-1991, *supra,* sec. 194.
[37] 29 LPRA sec. 194b.
[38] Artículo 2 (c) de la Ley 115-1991, *supra,* sec. 194b; *Velázquez Ortiz v. Mun. De Humacao, supra,* págs. 670-671.
[39] *Rivera Menéndez v. Action Service,* 185 DPR 431, 445 (2012).
[40] *Íd.*, citando a *Rentas Santiago v. Autogermana, Inc.,* 182 DPR 759 (2011).

Puerto Rico, (2) en los procedimientos internos establecidos de la empresa, o (3) ante cualquier empleado o representante en una posición de autoridad[41]. Al interpretar el segundo elemento de temporalidad en los casos *prima facie*, el Tribunal Supremo resolvió que, para que se establezca una inferencia de causalidad, bastará que el empleado pruebe que la acción adversa que experimentó ocurrió al *poco tiempo* de haber incurrido en la alegada actividad protegida[42].

No empece lo anterior, no todo caso se configura dentro de un espacio temporal que pueda catalogarse como de *poco tiempo*. Respecto a ello, nuestro Máximo Foro expresó lo siguiente:

> **Sin embargo, no todo caso se configura dentro de un espacio temporal que pueda catalogarse como de *poco tiempo*. Ante tales circunstancias, la proximidad temporal, como inferencia de causalidad, resulta insuficiente, por lo que se requiere entonces que el empleado constate elementos adicionales que comprueben la existencia de un nexo causal entre la actividad protegida y la acción disciplinaria adversa.** Así, el trabajador deberá presentar evidencia que establezca: (1) que fue tratado de forma distinta a otros empleados; (2) que existió un patrón de conducta antagónica en su contra; (3) que las razones articuladas por el patrono para fundamentar su acción adversa están plagadas de incongruencias, o (4) cualquier otra evidencia que obre en el expediente para establecer el elemento del nexo causal. Lo anterior implica, necesariamente, un acercamiento caso a caso.
>
> Claro está, hacemos la salvedad de que el análisis previamente esbozado solo satisface cuando el empleado establece un caso prima facie por represalias. Ello, pues una vez el patrono logre articular una razón no represiva para la acción adversa que tomó, se requerirá del empleado que, por preponderancia de la prueba, se valga de factores adicionales a la proximidad temporal para comprobar que las razones articuladas por el patrono no son más que meros pretextos destinados a ocultar el verdadero ánimo represivo[43]. (Énfasis suplido).

Una vez el empleado demuestre los dos criterios previamente explicados, entonces queda establecido su caso *prima facie* por represalias. Consecuentemente, se activa una presunción *juris tantum* de violación a la Ley Núm. 115-1991, *supra*. Para rebatir esta presunción el patrono estará obligado a comprobar que la

---

[41] Artículo 2 (c) de la Ley 115-1991, *supra*, sec. 194b.
[42] *Rentas Santiago v. Autogermana, Inc., supra*, pág. 767.
[43] *Feliciano Martes v. Sheraton*, 182 DPR 368, 400 (2011).

acción adversa que tomó contra el empleado estuvo justificada y libre de todo ánimo represivo[44]. Si el patrono logra efectivamente rebatir la presunción, el empleado aún puede prevalecer si prueba que la razón alegada por el patrono es un simple pretexto para una acción adversa represiva[45]. Sobre este particular, el Tribunal Supremo ha hecho la siguiente salvedad:

> [U]na vez el patrono logre articular una razón no represiva para la acción adversa que tomó, se requerirá del empleado que, por preponderancia de la prueba, se valga de factores adicionales a la proximidad temporal para comprobar que las razones articuladas por el patrono no son más que meros pretextos destinados a ocultar el verdadero ánimo represivo[46].

Es decir, si el patrono logra derrotar el caso *prima facie* del empleado, ya sea establecer la ausencia de nexo causal o la inexistencia de actividad protegida, entonces la carga probatoria aumenta para el empleado, pues ya no bastaría el elemento temporal que pueda catalogarse como de poco tiempo. Los factores adicionales, que debe probar el empleado, según el Tribunal Supremo, son: (1) que el empleado fue tratado de forma distinta a otros empleados; (2) que existió un patrón de conducta antagónica en su contra; (3) que las razones articuladas por el patrono para fundamentar su acción adversa están plagadas de incongruencias, o (4) cualquier otra evidencia que obre en el expediente para establecer el elemento del nexo causal[47].

### -C-

La Ley Núm. 80, *supra,* previo a sus enmiendas en el 2005, disponía explícitamente que, cuando el tribunal determinara que el despido se realizó por justa causa, ordenará al patrono a depositar una suma de honorarios no menor al quince por ciento (15%)[48]. Posteriormente en los trámites para enmendar la ley, según

---

[44] *Rentas Santiago v. Autogermana, Inc.*, supra, págs. 767-768.
[45] *Íd.*, pág. 768.
[46] *Feliciano Martes v. Sheraton, supra*, pág. 400.
[47] *Íd.*
[48] *C.O.P.R. v. S.P.U.*, 181 DPR 299, 340 (2011).

discutido en *Hernández Maldonado v. Taco Maker*, por error o inadvertencia se omitió la cantidad mínima del quince por ciento (15%)[49].

Ahora bien, el Tribunal Supremo analizó el trámite legislativo y determinó que la intención del legislador fue:

> [M]antener un porciento base – igual o mayor al que decretaba la ley desde 1976 – para el cómputo de los honorarios de abogado que pagaría el patrono en caso de falta de justificación del despido. **Empero, por error o inadvertencia se omitió un porcentaje específico que propicia el propósito** mismo de la Ley Núm. 80, *supra*. En conformidad con lo expresado, el inciso (b) del Art. 11 de la Ley Núm. 80, *supra*, **se debe leer con el quince por ciento (15%) añadido. Esto hasta que la Asamblea Legislativa disponga otra cosa**[50]. (Énfasis nuestro).

Luego de establecer un porcentaje base, se determinó que el juzgador puede estimar necesario otorgar una suma mayor a la antes establecida[51]. Para ello, la parte deberá solicitarlo mediante un memorando juramentado que contenga tanto las horas trabajadas como la tarifa a cobrar[52]. De modo que se debe elaborar de la siguiente manera:

> a. *Horas trabajadas y labor realizada*: deberá desglosar el tiempo invertido en el caso y especificar las tareas realizadas. Incluirá el trabajo realizado en revisiones y apelaciones, y en procedimientos administrativos, de ser ese el caso. Véase *Parker v. Califano*, 561 F.2d 320 (D.C. Cir. 1977).
>
> b. *Tarifa que cobra por hora en este tipo de caso*: el abogado deberá justificar su tarifa aludiendo a su experiencia, preparación y a cuánto se cobra tradicionalmente en ese tipo de casos. Podrá someter declaraciones juradas de otros abogados en las cuales éstos indiquen sus tarifas[53].

Además, se debe tener en cuenta "la novedad y dificultad de las controversias, [que] de ordinario, requieren más esfuerzo y dedicación por parte de los abogados"[54]. El TPI tendrá la discreción para aceptar o modificar la suma reclamada en los honorarios, podrá utilizar o considerar la experiencia y pericia para determinar

---

[49] *Hernández Maldonado v. Taco Maker*, 181 DPR 281, 296 (2011).
[50] *Íd.*, pág. 296.
[51] *Íd.*, pág. 297.
[52] *Íd.*, pág. 298.
[53] *López Vicil v. ITT Intermedia, Inc.*, 143 DPR 574, 583 (1997).
[54] *Íd.*, pág. 584.

la cantidad de tiempo razonable que se dedicó a cada tarea[55]. De igual forma, resulta imperativo que el foro primario consigne "por escrito sus razones para llegar a determinada suma. Sólo de esta manera ese cálculo podrá ser revisable y se evitarán abusos de discreción"[56]. Por último, los tribunales apelativos no podrán intervenir con la determinación de honorarios salvo que exista un abuso de discreción[57].

**III.**

En el caso de autos, debemos determinar si procedía declarar *No Ha Lugar* la *Moción de Sentencia Sumaria Parcial y en Solicitud de que se Bifurquen los Procedimientos* presentada por la señora Vega, en cuanto a la reclamación de represalias presentada al amparo de la Ley 115-1991, *supra*, y desestimar la misma con perjuicio.

Inconforme, la apelante solicitó que revoquemos parcialmente la *Sentencia* apelada, a los únicos efectos de declarar *Con Lugar* la moción de sentencia sumaria parcial en cuanto a la causa de acción de represalias, y devolver el caso al TPI para la celebración de una vista donde dicho foro pueda recibir prueba de la señora Vega de los daños sufridos a consecuencia de su despido en represalias. Esto, debido a que, según alegó en su recurso, la señora Vega incurrió en tres conductas protegidas bajo la Ley 115-1991, *supra*. Primero, cuando se quejó del salario que pretendían asignarle en su nueva posición en el Área de Cuentas por Pagar "*Accounts Payable*"[58]. Segundo, cuando se acogió a una licencia por enfermedad del 5 al 6 de marzo de 2024, pues la apelante había sido hospitalizada con síntomas de anemia[59]. Tercero, cuando la señora Vega se acogió a una licencia de vacaciones el 7, 8 y 11 de marzo de 2024, por motivo

---

[55] *Íd.*
[56] *Íd.*
[57] *Íd.*
[58] Recurso de *Apelación*, pág. 15.
[59] *Íd.*

de un viaje que tenía planificado previamente a Disney World con su familia[60].

En síntesis, la apelante arguyó que estableció su caso *prima facie* de represalias pues no existía controversia que incurrió en varias conductas protegidas por la Ley 115-1991, *supra*, y fue subsiguientemente despedida.

Tras un análisis minucioso del expediente ante nuestra consideración, resolvemos que el foro apelado no incidió en su determinación. Veamos.

Según adelantamos en la exposición del derecho, el primer paso del estándar de revisión de las solicitudes de sentencia sumaria es revisar el expediente *de novo* de la forma más favorable para la parte que se opuso a la solicitud de sentencia sumaria, y aplicar los mismos criterios de la Regla 36 de Procedimiento Civil, *supra*[61]. De igual forma, el segundo paso exige que revisemos que tanto la petición de sentencia sumaria como su oposición cumplan con los requisitos de la Regla 36 de Procedimiento Civil, *supra*[62]. Ahora bien, luego de examinada la solicitud de sentencia sumaria como su oposición, determinamos que ambos escritos cumplieron con los requisitos de la Regla 36 de Procedimiento Civil, *supra*. Por lo tanto, corresponde continuar al tercer criterio del aludido estándar de revisión apelativa sobre las solicitudes de sentencia sumaria.

El tercer paso conlleva revisar si en realidad existen hechos materiales en controversia. De haberlos, debemos cumplir con la exigencia establecida en la Regla 36.4 de Procedimiento Civil, *supra*, y exponer cuáles son los hechos materiales que están en controversia y cuáles son incontrovertidos. Luego una revisión

---

[60] *Íd.*

[61] *Roldan Flores v. M. Cuebas, supra,* pág. 679.

[62] *Íd.*

exhaustiva del expediente, concluimos que no existen hechos en controversia.

Al no existir hechos en controversia, pasamos al cuarto y último eslabón; por lo que, debemos revisar de *novo* si el TPI aplicó correctamente el derecho[63].

En particular, debemos resolver si la apelante participó de una actividad protegida por la Ley Núm. 115-1991, *supra*. De haber participado, fue subsiguientemente despedida en un acto de represalias.

Para así hacerlo, la apelante debió demostrar primeramente que ofreció o intentó ofrecer, verbalmente o por escrito, un testimonio, expresión o información ante un foro legislativo, administrativo o judicial, en algún procedimiento interno de la empresa, o ante cualquier empleado o representante en una posición de autoridad. En el caso de marras, se estableció como hechos incontrovertidos que la apelante: se quejó del salario que pretendían asignarle en su nueva posición en el Área de Cuentas por Pagar "*Accounts Payable*"[64]; se acogió a una licencia por enfermedad del 5 al 6 de marzo de 2024, pues había sido hospitalizada con síntomas de anemia[65]; se acogió a una licencia de vacaciones el 7, 8 y 11 de marzo de 2024, por motivo de un viaje que tenía planificado previamente a Disney World con su familia[66]. Somos de la opinión que, las tres instancias que adujo la señora Vega para establecer su caso *prima facie* no son actividades protegidas conforme a la definición expresa en el Artículo 2 de la Ley 115-1991, *supra*.

Por otro lado, aunque existe un elemento temporal de poco tiempo entre la reunión con la apelante y el despido, entiéndase el

---

[63] *Íd.*
[64] Recurso de *Apelación*, págs. 21, 68 y 73.
[65] Recurso de *Apelación*, págs. 23-24 y 198.
[66] Recurso de *Apelación*, pág. 22.

20 de marzo de 2024. Lo cierto es que, las partes pactaron en *La Hoja de Cambio*[67], en la parte titulada "Acuerdos", que la evaluación y revisión de salario se iba a discutir el lunes 4 de marzo de 2024[68]. Así pues, la mencionada evaluación no fue discutida el día que se pactó, sino el 20 de marzo de 2024. Esto, debido a que: (1) la apelante se enfermó y fue hospitalizada el 4 de marzo de 2024 y (2) aun cuando la señora Vega fue dada de alta el 6 de marzo de 2024, el 7 de marzo de 2024, se fue de viaje tal cual fue previamente autorizado por la empresa.

Por otra parte, surgió de la oposición de sentencia sumaria de Antilles que, el despido de la apelante surgió debido a que esta no completó exitosamente su evaluación del puesto de Área de Cuentas por Pagar "*Accounts Payable*"[69]. Es decir, la determinación de la apelada de despedir a la señora Vega surgió desde el 4 de marzo de 2024, fecha pactada para discutir la evaluación. Sin embargo, no podemos concluir que Antilles incurrió en represalias, pues todas las acciones afirmativas de la apelada que dieron base para las alegaciones de la señora Vega fueron posteriores a la determinación del despido. Por lo tanto, queda constatado que la apelante no probó su caso de *prima facie* de represalias.

Por ende, tras examinar la *Moción de Sentencia Sumaria Parcial y en Solicitud de que se Bifurquen los Procedimientos*, establecemos que **no existen** hechos controvertibles esenciales pertinentes a la controversia que nos ocupa, a saber:

1. El 30 de noviembre de 2023, Annette López, la "*Controller*", reunió a la señora Vega y le hizo el acercamiento de que pasara a trabajar al Área de Cuentas por Pagar "*Accounts Payable*". Debido a que la apelante tenía experiencia previa en compras y logística, y conocía a algunos suplidores.

2. Cuando la "*Controller*", Annette López, le hizo el acercamiento a la señora Vega para que pasara a trabajar al Área de Cuentas por Pagar "*Accounts Payable*", la

---

[67] Recurso de *Apelación*, pág. 185.
[68] *Íd.* y Recurso de *Apelación*, pág. 42.
[69] Recurso de *Apelación*, pág. 233.

Querellante se quejó verbalmente con Annette López con relación a su compensación en dicha nueva posición.

3. La señora Vega también discutió y se quejó verbalmente sobre el asunto del salario en su nueva posición con el General Manager, José Escobar.

4. La Hoja de Cambio que reflejó el cambio de posición de la señora Vega al Área de Cuentas por Pagar "*Accounts Payable*" indicó que la fecha de efectividad del cambio era el 4 de diciembre de 2023, y estableció lo siguiente: "Según discutido con la empleada, se estará evaluando su progreso y dominio de sus nuevas tareas por los próximos tres meses. Una vez muestre dominio de las tareas, se procederá a una revisión de salario."

5. La Hoja de Cambio, en la parte titulada "Acuerdos", indicó que el "Acuerdo" era realizar una evaluación y revisión de salario el 4 de marzo de 2024.

6. La señora Vega comenzó en su nueva posición de Área de Cuentas por Pagar "*Accounts Payable*" durante la semana del 11 al 15 de diciembre de 2023.

7. El 5 de febrero de 2024, la señora Vega le envió a la "*Controller*", Annette López, por el sistema de nómina ADP, una solicitud de tres (3) días de vacaciones, específicamente el jueves 7, viernes 8 y lunes 11 de marzo de 2024, respectivamente, regresando al trabajo el martes 12 de marzo de 2024. Ello, pues la apelante tenía planificado un viaje familiar a Disney World en Florida. La "*Controller*" le aprobó la solicitud de vacaciones inmediatamente a la apelante, quien tenía balance más que suficiente para solicitar esos tres (3) días.

8. El 4 de marzo de 2024 era la fecha en que se suponía que se evaluara el desempeño de la señora Vega en su nueva posición y se discutiera el asunto del salario.

9. El 4 de marzo de 2024, antes de entrar a trabajar, la señora Vega visitó un laboratorio médico para hacerse unos exámenes. Durante su periodo de almuerzo, la apelante recibió una llamada del laboratorio para saber si había recibido los resultados de los análisis y le dejaron saber que tenía que pasar por una sala de emergencia lo antes posible, pues tenía la hemoglobina sumamente baja.

10. La señora Vega le dejó saber a su supervisora, la "*Controller*", Annette López, lo que le habían indicado del laboratorio, y ésta le indicó que se fuera lo antes posible para el hospital, y que le dejara saber si al día siguiente no iba a poder ir a trabajar.

11. El 4 de marzo de 2024, no se llevó a cabo la evaluación del desempeño de la señora Vega en su nueva posición, ni se discutió el asunto de la compensación, pues la señora Vega fue hospitalizada en el Hospital Menonita de Humacao con síntomas de anemia.

13. El 5 de marzo de 2024, a través de WhatsApp, la señora Vega le escribió a la "*Controller*" que no iba a poder presentarse a trabajar debido a que estaba hospitalizada y que estaba esperando una transfusión de sangre. Ese mismo día, por la tarde, la "*Controller*" le escribió preguntándole que cómo había seguido, y la apelante le indicó que estaba mejorando y que ya le habían puesto la segunda bolsita de

la transfusión de sangre. La "*Controller*" le dijo a la señora Vega que si necesitaba más tiempo podía tomar todo el tiempo que necesitara, a lo que la apelante le respondió que gracias.

14. El 6 de marzo de 2024, la Dra. Jivet Morales le dio de alta a la señora Vega y le entregó un certificado médico recomendándole Descanso por diez (10) días.

15. A las 9:57 p.m. del 6 de marzo de 2024, la señora Vega le envió un mensaje por WhatsApp a la "*Controller*", Annette López, indicándole que le habían dado un certificado médico recomendando descanso por diez (10) días y que le iba a enviar copia del mismo al día siguiente por email.

16. El 7 de marzo de 2024, en horas de la mañana, la señora Vega viajó a Orlando, Florida para ir a Disney World con su familia, según tenía planificado.

17. El 7 de marzo de 2024, a las 9:06 a.m., la "*Controller*", Annette López, le envió el siguiente mensaje de WhatsApp a la señora Vega: "Hola que disfruten. Recuerda enviarme el certificado antes del lunes." Ese mismo día, a las 10:30 a.m. la apelante le envió a la "*Controller*" mediante correo electrónico el certificado médico. Así pues, a las 11:41 a.m. la "*Controller*" confirmó el recibo del mismo.

18. La señora Vega regresó de su viaje a Disney World en la madrugada del 12 de marzo de 2024.

20. El 18 de marzo de 2024, la señora Vega se reportó a su trabajo y entregó el original del certificado médico.

21. El 20 de marzo de la señora Vega se reportó a trabajar y luego del periodo de tomar alimentos de la apelante, la "*Controller*" le solicitó que se reportara a la oficina del Gerente General, José Escobar, para discutir la evaluación.

22. La señora Vega se reportó a la oficina del Gerente General, según solicitado. El Sr. Escobar le dio a la apelante copia impresa de la evaluación del periodo de los tres meses en la nueva posición de Cuentas por Pagar "*Accounts Payable*" para que cotejara la misma. La apelante observó la evaluación y se percató que el resultado de todos los criterios de evaluación era "insatisfactorio" o "necesita mejorar", y que el resultado final de la evaluación había sido "insatisfactorio".

23. En el primer punto, titulado "Knowledge of Work", la señora Vega obtuvo una puntuación de dos (2) ("developing"), y el comentario escrito que tiene la evaluación es el siguiente: "The employee understands her roles on the accounts payables but has not shown interest on taking ownership on her responsibilities as an accounts payable specialist".

24. En el segundo punto, titulado "Productivity", la señora Vega obtuvo una puntuación de uno (1) ("unsatisfactory"), y el comentario escrito que tiene la evaluación es el siguiente: "After 3 months on the position, Zuleika hasn't been able to set herself timelines to finish her task. She has requested vacations during her period of performance evaluation".

25. El Gerente General, José Escobar, le notificó a la señora Vega que estaba despedida inmediatamente.

Por último, cabe destacar que el foro apelado no concedió honorarios como exige la Ley Núm. 80, *supra.* Como mencionamos, el Tribunal Supremo ha resuelto que según la intención legislativa de la Ley 80 Núm., *supra*, esta contempla un porcentaje mínimo a otorgar en concepto de los honorarios. Ante ese mandato nos corresponde modificar la sentencia a los efectos de conceder el quince por ciento (15%) de honorarios a la Sra. Vega conforme al estatuto antes citado.

**IV.**

Por los fundamentos que anteceden, los que hacemos formar parte de este dictamen, ***modificamos*** la *Sentencia* apelada emitida por el Tribunal de Primera Instancia, Sala Superior de Carolina a los fines de conceder el quince por ciento (15%) de honorarios a la señora Vega conforme a la Ley Núm. 80, *supra*, y, así modificada, la ***confirmamos***.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones. El Juez Adames Soto concurre sin voto escrito.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones